THOMPSON, Presiding Judge.
Lucile Williams Ray (“the wife”) appeals from a judgment of the Jefferson Circuit Court (“the trial court”) divorcing her from Daniel Ray (“the husband”). In the judgment, the trial court divided the parties’ marital property and reserved the right to award the wife periodic alimony. The trial court also ordered the husband to pay the wife $5,702 in past-due pendente lite support.
Most of the evidence presented in this case was disputed,- with each party casting himself or herself in the role of “victim.” The testimony taken during the ore tenus trial of this matter indicates the following.
The parties were married in 1987; They had two children, both of whom were adults by the time of the divorce. At the time of the trial, the wife was 48 years old; the husband was 50 years old. The parties’ first child was born in 1986. The wife had been attending a junior college at the time, but she stopped going to school to care for the baby. The husband, who “went to the 11th grade,” worked full tune and supported the family. He testified that" he understood the need for the wife to stay home with the baby; however, he said, he encouraged her to go back to school. The parties’ second child was born in the early 1990s.
The wife testified that she wanted to work outside the home but that the husband would not allow her to do so. The wife testified that when she brought up the possibility of working or returning to school, the husband accused her of only wanting “to be out to. meet guys.” The parties’ older child echoed the wife’s testimony regarding the husband’s refusal to allow the wife to work.
When the parties married, the husband said, he was working as a laborer for Gold Kist, Inc. He worked at the Gold Kist plant for 12 years, until the plant closed in 1998. The husband has a retirement account with Gold Kist that he can begin drawing from when he reaches age 55. The record does not indicate the amount of the retirement account. When the older child reached age 10 or 11 and the younger child was 5, the husband said, “things started getting rough.” He testified that he asked the wife to find a job to help, but, he said, she “flat out refused.” After leaving Gold Kist, the husband obtained a job with Rock Wool Manufacturing Co. (“Rock Wool”); he was still working for Rock Wool at the time of the trial. The evidence is undisputed that, for a time, while he was working full time for Rock Wool, the husband also worked a second full-time job to make ends meet. In the years leading up to the divorce, the husband worked full time for Rock Wool and part time at Fred’s Drug Store. He left the job at Fred’s two weeks before the trial started. The husband testified that, at age 50, his blood pressure was high and that he could no longer work two jobs because he needed more rest. Documents in the record *1231 indicate that in 2012 the husband earned $44,606.20 from Rock Wool and $15,839 from Fred’s, for a total income of $60,445.20. In 2013, the husband earned $38,897.39 from Rock Wool and $11,662.91 from Fred’s, for a total income of $50,560.03. The husband’s hourly wage from Rock Wool at the time of trial was $18.25. Thus, without income from Fred’s, the husband’s gross monthly income at the time of trial from his full-time job -with Rock Wool was approximately $2,920. The husband testified that his monthly expenses were $2,074. Although the husband does not have a valid driver’s license, his expenses included a $370 a month automobile payment and automobile insurance of $155. The husband said that his sister drove the vehicle.
The wife testified that the husband left the family for days, weeks, or months at a time during the marriage. During those absences, the wife said, the husband would leave them without a vehicle, food, or financial support. She said that the husband was a crack-cocaine addict and that he was going on “binges” during the times he left the house. However, she acknowledged that he kept working during his absences and that his addiction “apparently” had no effect on his ability to work.
The husband testified that he had taken part in a substance-abuse program in the late 1990s and that he had not used illegal drugs since that time. He explained that, throughout his employment with Rock Wool, he had been required to submit to random drug testing at least three times a year. He said that “it would be almost impossible for me to have been down there the length of time that I’ve been down there and still be doing drugs.”
In 2010, the wife said, the husband left the marital residence for more than one month and took both vehicles the parties had. He did not provide the wife with, any support during that time, the wife said. In 2012, just before the wife filed the divorce complaint, the husband left the marital home again. At that time, the wife said, the husband stole money the older child was planning to use to pay for his own child’s child support. The wife testified that the husband had the power turned off at the marital residence while he was away.
The husband conceded that he had left the marital residence at times. However, he disputed the wife’s testimony that he kept the money from his paychecks, saying that he would give her the paychecks to cash so that she could pay bills. He testified that, during the marriage, he would have to ask the wife for money for things like cold drinks or cigarettes, but, he said, the wife would not always give him the money for such purchases. The husband acknowledged, that the bills were paid, so he did not question what the wife did with the money.
The last time the husband left home, he said, was in 2012, just before the wife filed the divorce complaint. The husband said that he left the marital residence then because the wife and the parties’ children were being physically abusive to him. He said that the wife stood by and watched as the children, now grown men, hit and kicked him and that he could not take living with the wife any longer.
Even during the times the husband was not living with the family, the wife said, she was “forbidden” to work. She said that the husband threatened to leave if she went to work. During the husband’s absences, the wife said, she did not attempt to work because she did not know when the husband would be coming back. The wife said that the only time she worked during the marriage was for a period in 1997 when the parties separated for a time. Even then, the wife said, the hus *1232 band took the parties’ car and she had to walk to work or have ’people take her to and from work. Eventually she lost that job, she said. She testified that she had no real work experience or training.
At the time of the trial, the wife was working at a service station earning $8 an hour; Her monthly take-home pay was $840, she said. She presented évidence indicating that her monthly expenses totaled $2,080. In July 2013, the husband was ordered to pay the wife pendente lite support of $600 a month. However, the husband did not make any of the ordered payments, saying that he did not believe that the wife “deserved it.” He testified that the wife “wasn’t never no wife to me. Why should I have to keep on paying her.” He added that he had given her all of his money for 25 years.
The wife testified that, at times during the marriage, the husband had been physically abusive, shoving her and wrestling with her. The older child testified that the husband would put the wife in “head locks.” Early in the marriage, the wife said, the husband broke her hand by squeezing it too hard. The husband also had been emotionally and mentally abusive throughout the marriage, the wife said. For example, she said, he would call the wife “dumb” and would tell her that she did not know how to work.
The husband denied that he had physically abused the wife, but he- claimed that she had abused him. The husband lost an eye in 1987 or 1988. The wife testified that the husband had been “smoking [marijuana] and drinking the whole day” when he fell down the stairs and hit his head on the railing. Because of the fall, she said, the doctors removed the husband’s eye. She also said that she was not present when the husband fell. The husband testified that he lost his eye when the wife threw a pot at him and the handle hit him in the eye. On some occasions when he was sick and unable to go to work, the husband testified, the wife would become physically abusive toward him.' For example, he testified that on one occasion, when he said he was not going to go to work, the wife had become angry and had’thrown hot grease on him, burning his leg. She also “attacked” him with knives on several occasions, he said.
The husband related an incident in which he had received a ride home from work with a woman whose brother he was staying with at the time.[1] The husband said that the wife pulled up in her car and that she had a gun. He said that the wife thought the husband and the woman were having an affair (which the husband denied) and that the wife tried to shoot the husband, but, he said, the gun “clicked and hung up.” By the time the police arrived, the husband said, he had taken the gun from the wife. The wife placed the blame for the incident on the husband. Initially, she testified that the husband “took the gun,” then, immediately afterward, she stated that the husband had the gun first and that she never had it. It is undisputed that the wife was convicted for harassment as a result of the incident. The husband and the wife were both arrested at the scene of the incident, but only the wife was convicted.
The wife accused the husband of having affairs during the marriage. She also claimed that the husband had engaged in sexual relations with one of the husband’s sisters during the time the wife was pregnant with the parties’ second child. The wife stated that the husband’s mother, who was deceased by the time of the trial, had told her of “catching” the husband with his *1233 sister. The parties’ older child testified that the extended family and community “knew” that the husband and his sister had had sex. The husband testified that he was close to his family but that he never engaged in sexual relations with his sister. A second sister of the husband testified that the incident did not occur.
On April 11, 2014, the trial court entered a judgment divorcing the parties. In its judgment, the trial court found both parties at fault for contributing to the breakdown of the marriage, “especially by the wife putting the husband’s eye out and drug use on the part of the husband.” Each party was awarded his or her own personal property, bank or retirement accounts in'his or her own name, and other items each had in his or her possession at the time the judgment was entered. The parties did not own the marital residence or any other real property. The husband was ordered to pay the wife a lump sum of $5,702, which represented the amount of alimony he owed in pendente lite support. The trial court also “reserve[d] the right and power to award periodic alimony to be paid by the [husband] towards the support and maintenance of the [wife] in the future, upon proper petition therefore by the [wife], and proof of circumstances then existing justifying such an award.”
The wife filed a timely motion seeking to alter, amend, or vacate the judgment: The trial court denied the postjudgment motion, and the wife filed a timely notice of appeal.
On appeal, the wife asserts that the trial court erred in denying her periodic alimony.
“A divorce judgment that is based on evidence presented ore tenus is afforded a presumption of correctness. Brown v. Brown, 719 So.2d 228 (Ala.Civ.App.1998). This presumption of correctness is based upon the trial court’s unique position to observe the parties and witnesses firsthand and to, evaluate their demeanor and credibility. Brown, supra; Hall v. Mazzone, 486 So.2d 408 (Ala.1986). A judgment of the trial court based on its findings of facts will be reversed only where it is so unsupported by the evidence as to be plainly and palpably wrong. Brown, supra. However, there is no presumption of correctness in the trial court’s application of law to the facts. Gaston v. Ames, 514 So.2d 877 (Ala.1987).”
Robinson v. Robinson, 795 So.2d 729, 732-33 (Ala.Civ.App.2001).
“A trial court’s determination as to alimony and the division of property following an ore tenus presentation of the evidence is presumed correct. Parrish v. Parrish, 617 So.2d 1036 (Ala.Civ.App.1993). Moreover, issues of alimony and property division must be considered together, and the trial court’s judgment will not be disturbed absent a finding that it is unsupported by the evidence so as to amount to an abuse of discretion. Id.”
Morgan v. Morgan, 686 So.2d 308, 310 (Ala.Civ.App.1996). Although a trial court’s determination as to. alimony and the division of property is presumed correct, that determination is still subject to appellate review. Moody v. Moody, 641 So.2d 818 (Ala.Civ.App.1994).
“The determination of whether the petitioning spouse has a need for periodic alimony, of whether the responding spouse has the ability to pay periodic alimony, and of -whether equitable principles require adjustments to periodic alimony are all questions of fact for the trial court, Lawrence v. Lawrence, 455 So.2d 45, 46 (Ala.Civ.App.1984), with the last issue lying particularly within the discretion of the trial court. See Nolen *1234 v. Nolen, 398 So.2d 712, 713-14 (Ala.Civ.App.1981). On appeal from ore tenus proceedings, this court presumes that the trial court properly found the facts necessary to support its judgment and prudently exercised its discretion. G.G. v. R.S.G., 668 So.2d 828, 830 (Ala.Civ.App.1995). That presumption may be overcome by a showing from the appellant that substantial evidence does not support those findings of fact, see § 12-21-12(a), Ala.Code 1975, or that the trial court otherwise acted arbitrarily, unjustly, or in contravention of the law. Dees v. Dees, 390 So.2d 1060, 1064 (Ala.Civ.App.1980).”
Shewbart v. Shewbart, 64 So.3d 1080, 1089 (Ala.Civ.App.2010).
Each party in this case disputed virtually every aspect of the testimony of the other. It is apparent from the record that at least some of the testimony was not truthful. For example, either the husband asked the wife to obtain employment to help with the household bills or he forbade the wife from working; either the wife threw a pot at the husband, hitting him in the eye, or she did not. The trial court explicitly found that the wife had caused the husband to lose his eye. We recognize that reconciliation of conflicting testimony, or determining the credibility of the witnesses, is a job left to the trial court, and it is not the province of the appellate court. “It is the province of the trial courts to estimate the credibility of witnesses, and if the trial court concludes that a witness was willfully untruthful, that court may disregard any or all of that witnesses’s testimony.” Summers v. Summers, 58 So.3d 184, 188 (Ala.Civ.App.2010). See also Bunn v. Bunn, 628 So.2d 695, 697 (Ala.Civ.App.1993) (“[T]he trial court may disbelieve and disregard portions of testimony and should accept only that testimony it considers worthy of belief.”).
We cannot say that the trial court’s explicit findings in this case were not supported by the evidence or that the findings are plainly and palpably wrong. However, as has often been said, there is no presumption of correctness in the trial court’s application of law to the facts. Gaston, 514 So.2d at 878. In this case, the parties were married more than 25 years. The husband provided the only means of support for the family throughout most of the marriage. Although the husband now has only one job, his income from that job alone has exceeded $30,000 for each of the last three years. The wife’s take home pay from her current job is approximately $10,080 annually. In other words, even before taxes are deducted from them pay, the wife earns less than half of what the husband earns. The wife also presented evidence indicating that her monthly expenses of $2,080 exceed her monthly take-home pay by approximately $1,240 each month. The husband’s gross monthly income is approximately $2,920 each month, and he has monthly expenses of $2,074. We note, however, that $525 of the husband’s monthly expenses are attributable to a car payment and an automobile-insurance payment for an automobile that the husband said his sister drives. If the car-related expenses are deducted from the husband’s monthly expenses, those expenses total $1,549,
Although the wife does not allege that the trial court erred in dividing the marital property, we note that the division of marital assets must be considered together with an award of alimony, if any. Here, the trial court awarded the husband all of his interest in the retirement accounts he had with Gold Kist and Rock Wool. The record does not indicate the amount of either account, but it is undisputed that both were accumulated during the course of the marriage, which lasted more than 25 *1235 years. The trial court awarded the wife all of the interest she had in her retirement accounts and mentions a 401 (k) plan; however, there is no evidence in the record that the wife had a retirement account of any type. The parties did not own the marital residence, and there is no evidence that they had any other substantial material assets subject to division.
In its judgment, the trial court stated that the wife could petition the court to prove circumstances justifying the award of periodic alimony from the husband. We conclude that the wife has already made such a showing, and there is no reason to require her to submit to further litigation to receive periodic alimony. Accordingly, we reverse the judgment of the trial court denying the wife periodic alimony, and we remand this cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN and MOORE, JJ., concur.
THOMAS, J., dissents, with writing, which DONALDSON, J., joins.

. The husband's driver's license has been suspended since the mid-1990s.